FILED
2016 Sep-19  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **STANLEY L. CURRY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.: 1:15-CV-909-VEH** |
| **TALLADEGA HOUSING** | ) | |
| **AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

This employment discrimination case was filed on June 1, 2015, by the Plaintiff, Stanley G. Curry, against the Defendant, his former employer, the Talladega Housing Authority ("THA"). (Doc. 1). The Complaint alleges that the Plaintiff was terminated, on account of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count One).

The case comes before the Court on the Defendant's Motion for Summary Judgment. (Doc. 13). For the reasons stated herein, the motion will be **GRANTED**, and this case will be **DISMISSED with prejudice**.

## I.    STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there

is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the

non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.     THE DEFENDANT'S MOTIONS TO STRIKE

The Defendant scatters motions to strike throughout its reply brief. The Plaintiff filed a short response to the Defendant's motions to strike which merely stated that he "continues to stand by all previous responses." (Doc. 24 at 1-2). For the reasons stated in this section, the motions to strike will be **DENIED**.

### A.     <u>The Plaintiff's Responses to the Defendant's Proffered Facts</u>

The Defendant moves to strike certain of the Plaintiff's responses to facts the Defendant has proffered in support of its Motion for Summary Judgment. (Doc. 23

at 5-7, ¶¶3, 5, 8, 15, 16, 18, 19, 21, 32, 33, 40, 41, 43, and 44). As to paragraphs 3, 18, and 19, the Defendant argues that they are "irrelevant" and "immaterial" "under the provisions of Rules 401 and 403 of the *Federal Rules of Civil Procedure*." (Doc. 23 at 5-6, ¶3; doc. 23 at 6, ¶¶18, 19) (italics in original). The Court assumes that the Defendant meant to cite to the Federal Rules of <u>Evidence</u>. Rule 403 of the Federal Rules of Evidence describes circumstances under which <u>relevant</u> evidence may be excluded. The Defendant has failed to explain how either rule applies here. Further, the court will examine the relevance of any particular fact when assessing what should and should not be included in this opinion. Only material facts will be used as a basis for this Court's analysis.

The Defendant moves to strike the remaining responses as allegedly without evidentiary support. The Court points out that, to the extent a proffered fact is not disputed, it is typically included in this opinion.[1] To the extent a proffered fact is disputed, the Court examines the evidence offered by both sides to see if the evidence supports a dispute. If so, the fact is cast in the light most favorable to the non-movant. When no evidence is cited to support the dispute of a proffered fact, and the Court is aware of no other evidence establishing a dispute, the proffered fact is typically

---

[1] The Court's process is more fully described in Appendix II to the Court Uniform initial Order.  (Doc. 2 at 14).

included to the extent it has an evidentiary basis. Accordingly, there is no reason to "strike" unsupported responses, and the Court will not do so.

**B.    <u>The Plaintiff's Proffered Facts</u>**

The Defendant has also moved to strike certain of the Plaintiff's facts proffered in opposition to the Motion for Summary Judgment. (Doc. 23 at 1-5, ¶¶ 48, 49, 51, 52, 53, 57, 58, and 62). The Defendant makes the same arguments for striking these facts that the Court addressed in the previous section. For those same reasons, the Court will not strike these proffered facts, but will handle them as explained above.

## III.   FACTS

The Plaintiff, Stanley G. Curry, is an African American male who was hired by THA on February 2, 1990.

**A.    <u>Safety Policy</u>**

On February 8, 2007, the Plaintiff signed a document confirming that it was his responsibility to read and know the contents of the THA employee Safety Policy, and thereafter abide by the policies and procedures therein to the best of his abilities. He also confirmed that he had the right to request clarification as needed to fully understand his responsibilities as set forth in the Safety Policy.

Section II, paragraph 19 of that policy provides: "Possession of firearms or other weapons while on THA property, in THA vehicles, or while conducting THA

business is strictly prohibited except for THA Investigative officers who are licensed to carry firearms." (Doc. 14-4 at 4) (original bold omitted). The Plaintiff had never been an investigative officer for THA at any time during his employment. (Doc. 14-3 at 2).

Section VII, N, paragraph 1, of the Safety Policy provides: "In addition to any regulation required by the THA, all drivers of THA vehicles will comply with state law governing said vehicles." (Doc. 14-4 at 15) (original bold omitted). Section VII, N, paragraphs 13b and 13e provides that employees who are required to operate a moving vehicle must "[k]now and obey the applicable federal, state, county, and city laws and regulations [of the area] in which they are driving," and "[c]omply with all posted speed limits, signs and signals, and make a complete stop at all stop signs." (Doc. 14-4 at 16).

### B.   The Vehicle Use Policy

On or about January 14, 2013, the Plaintiff confirmed that he received, read and understood the Vehicle Usage Policy of the THA and agreed to abide by the rules and regulations set forth therein. That policy provides in part:

3.     [THA] vehicles shall not be used for personal business unless prior approval is granted by the Executive Director and/or Board of Commissioners.

\* \* \*

7

5.     Driving under the influence of drugs or alcohol shall be cause for immediate termination.

(Doc. 14-6 at 1). The Plaintiff had never been given approval to drive a THA vehicle for personal business by the Board of Commissioners or the Executive Director, Nettie Goodwin. (Doc. 14-3 at 3-4). However, in her deposition, Goodwin stated that it was not a violation of company policy to use a company vehicle to go back and forth from home to work. (Doc. 19 at 3(8)). She also admitted that employees could use a company vehicle to run errands which were "on the way home." (Doc. 19 at 3(8)).

## C.     Drug-Free Workplace Policy

On or about February 8, 2007, the Plaintiff executed a document confirming receipt of the THA Drug Free Workplace Policy. That policy strictly prohibits employees from "[b]ringing and/or storing (including in a desk, locker, automobile, or other repository) alcohol on [THA] premises or property, including [THA]-owned or leased vehicles, or vehicles used for [THA] purposes." (Doc. 14-5 at 6). The policy also states: "*As an exception, storage of sealed, unopened alcohol containers in a vehicle on* [*THA*] *property is not a violation.*" (Doc. 14-5 at 6) (italics in original). The policy also prohibited employees from "[h]aving possession of, being under the influence of, testing positive for or having in one's system, alcohol [during work time

or on THA premises or property]." (Doc. 14-5 at 6).

### D.   **The Traffic Stop**

On or about February 3, 2014, the Plaintiff was driving a THA vehicle through THA property when he was stopped by City of Talladega Police Officer, John McCoy. The Plaintiff was off work at the time of the stop. McCoy testified in his deposition:

> When I heard him coming, I started looking to try to figure out where the vehicle was coming from, and I looked up and saw the truck coming toward the entrance exit area . . . and he come [sic] over the speed breakers. And I saw the rate of speed he was going and made the determination I was going to pull him over. So when he came by me, I pulled out behind him.

(Doc. 14-19 at 3(12)-4(13)). McCoy wrote the Plaintiff a ticket for: "Reasonable and prudent speed." (Doc. 14-19 at 4(15)). McCoy testified that the speed limit in that area was 15 miles per hour, and that the Plaintiff was going "[w]ell over 15 miles an hour." (Doc. 14-19 at 4(15-16)).[2] The Plaintiff denies that he was speeding, but he

---

[2]  The Plaintiff disputes these facts and cites his deposition at pages 38 and 39.  (Doc. 17 at 3 ("Plaintiff denies that he was speeding when arrested by Officer John McCoy.")) (citing doc. 14-20 at 10(38-39)) Nothing in the cited portion of the Plaintiff's deposition disputes that he was speeding.  It merely recounts the following exchange which he says took place between he and McCoy:

> I said I ain't driving no faster than I've been driving.  And I said why did you stop me?  He said well – he said I was speeding.  And I asked him how fast I was going.  He said I don't have a radar or nothing like that.  How can you tell how fast I was going, so how you know I was speeding?

(Doc. 14-20 at 10(38)).  Still, in another section of the Plaintiff's deposition, which the Plaintiff

ultimately pled guilty to that charge in the City of Talladega Municipal Court. (Doc. 14-20 at 9(36)-10(37), 11(41)).

McCoy also had the Plaintiff perform a field sobriety test. McCoy explained that he did so

> [b]ecause I smelled the odor of alcohol coming from his breath and person when I approached the vehicle, and during our contact, he admitted that he had drank I believe it was some tall boys prior to our contact.

(Doc. 14-19 at 5(18)). The Plaintiff testified that he told McCoy that he had not been drinking. (Doc. 14-20 at 10(38)). When asked how the Plaintiff did on the field sobriety test, McCoy stated "[h]e didn't fail it." (Doc. 14-19 at 4(14)).

McCoy searched the vehicle during the stop. He stated:

> There were several empty beer cans. I think one empty beer can as a matter of fact was a tall boy in the cab, and I think there was a full unopened tall boy in the bed of the truck.

(Doc. 14-19 at 5(19)). McCoy also remembers "a lot of beer cans in some type of container." (Doc. 14-19 at 6(21)). He put the number of cans at "maybe between five and 15." (Doc. 14-19 at 6(22)). When the Plaintiff was asked about this subject in his deposition, the following exchange took place:

---

did not cite, he was asked "What did he stop you for?" to which the Plaintiff responded, "To me nothing, but he said I was speeding." (Doc. 14-20 at 9(36)). The Court will give the Plaintiff the benefit of the doubt here and holds that a reasonable jury could consider this a denial that he was speeding.

Q.     But there was, you know, there was beer cans in the truck, wasn't there?

A.     Plenty.

Q.     Plenty of beer cans in the truck.

A.     Yes, sir. Not in the truck.

Q.     What kind of beer cans were they?

A.     All kinds, Coke, beer bottles, all of them.

Q.     Those were open?

A.     Yeah. Most of them, everything was open.

Q.     Where were those located?

A.     On the back of the pickup truck in a milk crate.

(Doc. 14-20 at 11(41-42)). When asked in his deposition how that alcohol got into the

truck, the Plaintiff testified:

> I pick up cans and things while working. I was told by Ms. Goodwin that when we come up on an area and the parking lot is nasty and dirty, we pick it up. And I kept a basket, a pickup stick and stuff on my truck when I do inspections. When I come out, I pick up and clean, clean up the parking lot, put it on the back of the truck in a crate, take it back to the shop and dispose of the trash, keep the cans, and I brought them home and save the cans.

(Doc. 14-21 at 8(113)). The Plaintiff testified that he "had authorization" to pick up

cans with alcohol in them and store them in the truck. (Doc. 14-21 at 8(113)).

McCoy also searched the Plaintiff's vehicle and found a 25 caliber automatic pistol. The Plaintiff had a permit to carry the pistol.

During his deposition, McCoy was asked if, during the traffic stop, he asked the Plaintiff what he was doing or where he had been. McCoy responded:

> Yes. He said – at first he said that he was on a call out, and then while we were talking, I asked him what was on fire. Why he was trying to get out of there so fast. And after we talked for a minute or two, he changed his story and said that he was out at another apartment seeing somebody and that his wife called him. He was trying to hurry up and get home. So that was the reason he was speeding coming out of public housing.

(Doc. 14-19 at 5(18-19)). In his deposition, the Plaintiff denied telling McCoy that he was seeing another woman at the housing community. (Doc. 14-20 at 10(37), 11(42)). Instead, the Plaintiff testified that he was there to get his fishing gear. (Doc. 14-20 at 11(42), 17(67)). The Plaintiff admits that he was off work at the time he was stopped by Officer McCoy. He was stopped at about 5:30 and he had gotten off work at 4:30.

In her affidavit, Goodwin stated:

> Officer McCoy was working under a contract between the [THA] and him to provide police services in or around properties owned by [THA] during certain of his off hours from the [THA]. Part of the agreement provided that he could be called away at any time for City of Talladega police work unrelated to the [THA], if he chose to do so. Neither I [nor] anyone else at the [THA] reserved or exercised at any time the right to control the methods, manner or means by which Mr. McCoy accomplished the final product for which [THA] contracted to wit:

12

engaging in police work in or around [THA] properties.

(Doc. 14-3 at 7).[3] However, in McCoy's deposition, the following exchange took place:

> Q.   Okay. On February the 3rd, 2014, were you employed and on duty at the Talladega Housing Authority?
>
> A.   Yes.
>
> Q.   Were you there as a Talladega Housing Authority employee or Talladega city police?
>
> A.   I was actually working for the Talladega Housing Authority.

(Doc. 14-19 at 2(6-7)). It is undisputed that McCoy had previously attended THA meetings with the Plaintiff, but, on February 3, 2014, stated that he did not know the Plaintiff.

### E.   Investigation by Goodwin

On February 3, 2014, Goodwin received a call from the Plaintiff where he stated: "I have messed up and I am in trouble." Goodwin told him to see her first thing in the morning. On the morning of February 4, 2014, Goodwin learned of the traffic stop previously described and hand delivered a letter to Curry outlining the

---

[3]  The Plaintiff disputes this account, saying that he and McCoy "knew each other and Mr. McCoy was an employee of THA when McCoy arrested the Plaintiff." (Doc. 17 at 3). In support of this statement, the Plaintiff cites his own deposition at page 47. (Doc. 14-20 at 12(47)). Nothing on that page of his deposition supports the Plaintiff's contention that McCoy was an "employee" of THA.

policy violations that may have been committed, suspended him without pay until February 17, 2014, and informed him that a decision would be made at that time regarding his continued employment. She also requested that he put in writing the events that led to the action and that might be relevant.

On February 8, 2014, Goodwin delivered a letter to the Plaintiff advising him that a hearing would take place on February 11, 2014, at 10:00, and at that time he would be given an opportunity to be heard prior to a decision being made. (Doc. 14-8 at 1). In that same letter, he was also given notice of that the following THA policies Goodwin felt may have been violated:

1.    Using a company vehicle for [a] person[al] reason.

2.    Speeding and driving recklessly in a company vehicle.

3.    Drinking while driving a company vehicle,

4.    Having alcohol in a company vehicle. . . .

5.    Having a weapon in a vehicle in violation of the Alabama State Statute. This violation occurred in a THA vehicle (property).

(Doc. 14-8 at 1). Goodwin's letter also noted that she had twice requested that the Plaintiff put in writing the events that took place, and that his written account had not yet been received.

The hearing of February 11, 2014, was conducted on that date and in the

fashion described in the letter of February 8, 2014. The parties have not cited the Court to any evidence as to the events of that hearing. On February 14, 2014, Goodwin hand delivered a letter to the Plaintiff extending his suspension to February 24, 2014. (Doc. 14-10).

On February 10, 2014, the Plaintiff provided his written account of the incidents made the basis of his suspension. (Doc. 14-9). In that letter, the Plaintiff admitted, among other things, that on the date of the stop:

– he drove the THA truck on a personal errand to pick up money that was owed to him, and then onto THA property to pick up his fishing gear;

– he put a bag with a gun and beer in it into the back of the truck;

– he took the gun out of the bag from the back of the truck because it started to rain; and

– McCoy found the gun in his coat during the traffic stop.

(Doc. 14-9 at 1).

Goodwin also reviewed a statement from McCoy, a statement from witness Kenneth Price, a report from Chief Investigator Tom Lloyd, phone records from a THA phone issued to the Plaintiff, and photographs of the alcohol containers found by McCoy in the Plaintiff's vehicle. (Docs. 14-11, 14-12, 14-13, 14-14, 14-15). In McCoy's statement, he stated, *inter alia*, that:

– the Plaintiff was speeding when he was stopped;

– the Plaintiff stated that he had been on THA property seeing a woman who was not his wife;

– the Plaintiff smelled of alcohol and his eyes were bloodshot when he was stopped;

– the Plaintiff admitted to drinking "two tall boys;"

– McCoy found an empty tall boy beer can and full tall boy beer can in the bed of the truck, along with several empty beer cans, and fishing gear; and

– McCoy found the Plaintiff's pistol in the Plaintiff's jacket pocket in the THA vehicle.

(Doc. 14-11). Price was the second officer on the scene of the traffic stop. Price confirmed that:

– the Plaintiff exuded a strong odor of alcohol while sitting in Price's patrol car; and

– Price asked the Plaintiff how many "alcoholic beers" he had had, and the Plaintiff stated "several."

(Doc. 14-12). In Lloyd's investigative report, he recounted McCoy and Price's statements, and also noted that when Lloyd secured the Plaintiff's personal items from the truck, the Plaintiff's bag (which was in the back of the truck) contained a full

can of beer. (Doc. 14-13 at 2).

On February 19, 2014, Goodwin delivered a letter to the Plaintiff saying that she had made a decision regarding his continued employment and she would inform him of that decision on February 24, 2014 at 10:00 in her office. (Doc. 14-16). On February 24, 2014, Goodwin authored a letter that she intended to give the Plaintiff which would terminate his employment and provide the reasons therefore. (Doc. 14-17). The reasons she listed were:

1.   Using a company vehicle for [a] personal reason.

2.   Speeding and driving recklessly in a company vehicle.

3.   Bringing and/or storing (including in a desk, locker, automobile, or other repository) alcohol on [THA] premises or property, including [THA]-owned or leased vehicles, or vehicles used for [THA] purposes.

4.   Having possession of, being under the influence of, testing positive for or having in one's system, alcohol.

5.   Using, consuming, transporting, distributing, or attempting to distribute, manufacturing, selling, or dispensing alcohol.

6.   Possession of firearms or other weapons while on THA property, in THA vehicles, or while conducting THA business . . ..

(Doc. 14-17).

The Plaintiff was terminated on February 24th.[4] Nettie Goodwin insists that when Mr. Curry arrived on February 24th for the anticipated meeting, he informed Nettie Goodwin that he would be resigning, effective that day, and delivered to her a letter to that effect. (Doc. 14-3 at 6; doc. 14-18). At the Plaintiff's request, she delivered to him the termination letter she had authored. (Doc. 14-3 at 6).[5] The Plaintiff testified that he did write a resignation letter, and he did walk into that meeting with it, but that he did not give it to Goodwin until <u>after</u> she terminated him. (Doc. 14-21 at 11(126-127)).

### F.   <u>The Disciplinary Policy in the Employee Handbook</u>

The THA employee Handbook provides, in pertinent part:

### M.   DISCIPLINARY PROCEDURE

---

[4]   The Plaintiff contends that he was "terminated from his employment." (Doc. 17 at 6, ¶48). The Defendant "denies that the [P]laintiff was terminated by . . . Nettie Goodwin." (Doc. 23 at 1, ¶48). The Defendant also moves the Court to strike the Plaintiff's claim that he was terminated "for lack of evidentiary support." (Doc. 23 at 1, ¶48). As noted above, there is evidentiary support for the Plaintiff being terminated. Further, the Court notes that fact 33, <u>proffered by the Defendant</u> states:

> 33.   The sole reason <u>Nettie Goodwin terminated the employment</u> was because of the clear violations of the applicable policies and the severity of those violations.

(Doc. 13 at 11, ¶33) (emphasis added). The Motion to Strike is **DENIED**.

[5]   The Plaintiff disputes the facts stated in these last two sentences, but cites the very same evidence, which supports the facts as stated. (*See* doc. 17 at 5, ¶32) (referring the reader to doc. 17 at 6, ¶48).

18

This section on employee disciplinary procedures and separations (Section N) is for guidance to supervisory personnel only. It is not a contract between the company and its employees. This section merely describes for supervisory personnel the company's general philosophy in grievance procedures and termination decisions. The company recognizes that each disciplinary decision and termination must be judged on its own particular facts. Fairness and common sense dictates that these unique situations will be reviewed and decided in the context of surrounding circumstances. The commissioners are responsible for all disciplinary actions that involve the Executive Director. To the extent possible, such actions shall be in the form and manner as described below:

a.   **Verbal warnings**

First offense, or first violation, of [THA] policies. All verbal warnings shall be documented by the supervisor. The date and time of the warning shall be indicated.

b.   **Written warning**

Second offense, or violation, of any [THA] policy within six months of the first violation.

c.   **Suspension without pay/termination of employment**

Suspension without pay . . . that may result in termination will be affected whenever an employee receives two written warnings within the same six-month period; or in the event an employee receives three written warnings within the same 12-month period.

Not withstanding [sic] any of the above, any employee who is away from duty for a two (2) day period without prior approval . . . or removes [THA] property or other property for his or her personal use or consumption is subject to

immediate termination.

All disciplinary action is subject to the Complaint Procedure (except of [sic] violations of the Alcohol and Substance Abuse Policy, see part V[6] for grievance process) as outlined in Section X[7] herein. Suspensions without pay, as noted in Section H.5[8], shall be authorized and recognized as a form of disciplinary action, but only by the specific authorization of the Executive Director.

(Doc. 18 at 3) (bold in original). Section N of the Employee Handbook provides that

employees are subject to "immediate suspension without pay and then dismissal" for

"violations of regulations." (Doc. 23 at 11).[9] In his deposition, the Plaintiff testified

that was not given any verbal or written warnings prior to his termination. (Doc. 14-

21 at 1(87)).[10]

## G.    <u>Comparators</u>

---

[6]   "Part V" has not been included in the record, so the Court cannot quote from or consider it.

[7]   "Section X" has not been included in the record, so the Court cannot quote from or consider it.

[8]   "Section H.5" has not been included in the record, so the Court cannot quote from or consider it.

[9]   Although a number of specific examples of such violations are mentioned, the policy is clear that the types of violations to which the section refers are not limited to those set out.

[10]   The Defendant disputes this fact but cites only letters from Goodwin to the Plaintiff regarding the traffic stop at issue in this case.  (*See* Doc. 14-7 at 1; doc. 14-8 at 1; doc. 14-10 at 1; doc. 14-16 at 1).  The Plaintiff's argument is that, if the Plaintiff committed a violation, the Defendant was obligated to warn him first and then, if he committed the same violation again, move up the progressive discipline policy.  Citations to letters regarding <u>this</u> incident are irrelevant to that point.

The only three individuals that the Plaintiff can identify as comparators are Steve Watts, Tom Lloyd, and Jay McElroy.

### 1. *Steve Watts*

The Plaintiff does not know of any time that Steve Watts violated the speeding policy or the policy of carrying a firearm or the policy of having alcohol in a company vehicle or in his system on THA property.

Goodwin testified in her deposition that she was aware of an incident between Watts, who is white, and Byron Garrett, who is African American, where Watts used racially derogatory language towards Garrett. (Doc. 20 at 3(33)). Watts was "written up" for that, but was not terminated. (Doc. 20 at 3(33)).

Watts at one time brought his grandson to work. Goodwin remembers telling Watts that he needed to find a baby sitter or go home. (Doc. 19 at 7(24)). She does not know where the child was. (Doc. 20 at 1(25)). She stated that "[s]omeone told me, and I contacted Steve and said you need to go home or send the child home." (Doc. 20 at 1(25)). She testified that she did so "[b]ecause the child shouldn't have been there." (Doc. 20 at 1(25)).[11]

---

[11]   The Plaintiff, who originally proffered the facts regarding Watts's grandson's presence on THA property, insists that the child was "on a backhoe [Watts] was operating."  (Doc. 17 at 7, ¶51).  None of the evidence cited by the Plaintiff supports that the child was on a backhoe Watts was operating.

### 2.    *Tom Lloyd*

The Plaintiff has no knowledge of Tom Lloyd, who is white, ever pleading guilty or being cited for speeding. He also has no knowledge of Lloyd not operating a vehicle at a reasonable speed. Lloyd is a police officer, so there have been times that he confiscated alcohol from people on THA property, but the Plaintiff knows of no other times that Lloyd had alcohol on THA premises.

Lloyd had his wife, who is not a THA employee, helping him with his office work in the THA office. Lloyd's wife was a volunteer employee for the THA who was on THA insurance. (Doc. 19 at 4(10-11)). Lloyd was not reprimanded for having her help out.

### 3.    *Jay McElroy*

The Plaintiff knows of no time that Jay McElroy was cited for speeding or having alcohol in THA vehicles or on THA premises or being in possession of firearms on THA property or in THA vehicles. McElroy allowed his son to ride a THA lawn mower and in a company truck with Byron Garrett, but Nettie Goodwin said she had no prior knowledge of these facts.

## IV.    ANALYSIS

The Complaint sets out only one claim:  race discrimination in violation of Title VII. In that claim, the Plaintiff alleges that he was discriminated against on the

basis of his race, African American, when he was fired as a result of the traffic stop which occurred on February 24, 2014. (Doc. 1 at 4).[12]

## A.   <u>Applicable Law</u>

Title VII provides:

> [i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e-2(a)(1). "In evaluating disparate treatment claims supported by circumstantial evidence[13], we use the framework established by the Supreme Court

---

[12]  The Defendant argues that the Plaintiff has claimed "two adverse employment actions to wit: (1) Being stopped by Officer John McCoy for speeding and (2) Being terminated from his employment by the Talladega Housing Authority." (Doc. 13 at 14).  However, in the only count of the Complaint, the Plaintiff alleges:

> Plaintiff has been treated less favorably <u>with respect to discipline</u> by the [D]efendant than similarly situated white male employees in that they were either not disciplined at all nor was their employment terminated.

(Doc. 1 at 4) (emphasis added).  There is no mention of the stop in Count One.  The Court will not address any arguments regarding whether Officer McCoy was an employee or agent of THA, or whether <u>McCoy's</u> actions amounted to discrimination.  (*See* doc. 13 at 14-15).

[13]  The Plaintiff, in the last line of his brief, argues that he "has proven by direct evidence, for the reasons stated in the above discussion that . . . THA[] racially discriminated against him." (Doc. 17 at 13).   Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption. . . . Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal quotations and citations omitted).  There is no direct evidence of discrimination in this case.

in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101

S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079,

1087 (11th Cir. 2004). Under that framework,

> [t]he Title VII plaintiff bears "the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). Thus, under the first part of *McDonnell Douglas,* the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination. If she does, the burden of production shifts to the employer, which requires the employer to introduce evidence of "some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas,* 411 U.S. at 802. If the employer satisfies its burden, "the presumption raised by the prima facie case is rebutted." *Collado v. United Parcel Serv. Co.,* 419 F.3d 1143, 1151 (11th Cir.2005) (internal quotation marks omitted). Because the burden of persuasion remains with the employee, she must then show that the seemingly legitimate reason the employer gave was pretextual—i.e., the "proffered reason was not the true reason for the employment decision." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal quotation marks omitted); *see also Collado,* 419 F.3d at 1150 (noting that once the employer satisfies its burden "the presumption of discrimination that arose when the plaintiff made [her] prima facie showing 'drops from the case,' and 'the case is placed back into the traditional framework—in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic' " (internal citations omitted)).

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013).

The Defendant argues both that the Plaintiff cannot establish a prima facie case

of discrimination, and that, even if the Plaintiff could do so, the Plaintiff cannot show that Defendant's legitimate proffered reason for the Plaintiff's termination was pretextual. The court will address each argument in turn.

### B.   The Plaintiff's Prima Facie Case

The Eleventh Circuit has noted:

> When . . . the plaintiff claims that his employer discharged him on account of his race, he must establish four elements: (1) that he is a member of a protected class . . . ; (2) that he was qualified for the position he held; (3) that he was discharged from that position; and (4) that in terminating his employment, his employer treated him less favorably than a similarly situated individual outside of his protected class . . . .

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011); *Connor v. Bell Microproducts-Future Tech, Inc.*, 492 F. App'x 963, 965 (11th Cir. 2012) (referring to the "discharge" element as being "subjected to an adverse employment action").[14]

_____

[14] The Defendant states the elements this way:

> To prevail on a claim of discrimination, a plaintiff must first establish a prima facie case. A prima facie case of desperate treatment such as the claim of the plaintiff herein on the basis of race, requires that the plaintiff show (1) He belongs to a protected class, (2) He suffered some form of adverse employment action and (3) The adverse employment action occurred under circumstances given [sic] rise to the inference of an unlawful discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)[.]

(Doc. 13 at 13). *St. Mary's* <u>actually</u> sets out the same elements as this Court. *See*, *St. Mary's*, 509 U.S. at 506 (noting that the plaintiff in that case had proven a prima facie case of

The Defendant agrees that the Plaintiff is a member of a protected class (doc. 13 at 13-14). However, it "denies that the [P]laintiff has suffered some form of adverse employment action." (Doc. 13 at 14). It also disputes that the Plaintiff can produce evidence that he was treated worse than similarly situated employees outside of his protected class.[15]

_____

discriminatory termination by showing: "(1) that he is black, (2) that he was qualified for the position of shift commander, (3) that he was demoted from that position and ultimately discharged, and (4) that the position remained open and was ultimately filled by a white man"). That is not to say that the Defendant is wrong. As explained recently by a panel of the Eleventh Circuit:

> "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The plaintiff must prove by a preponderance of the evidence that the challenged employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." *Id.*

*Kilgore v. Trussville Dev., LLC*, 646 F. App'x 765, 773–74 (11th Cir. 2016). However, the panel also noted:

> "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." [*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)]. In cases of termination, <u>the plaintiff generally must show that she is a member of a protected class and either was replaced by someone outside the protected class</u>, *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir.1995), <u>or was treated worse than similarly situated employees outside of her protected class</u>, *Wilson*, 376 F.3d at 1091.

*Kilgore*, 646 F. App'x at 774 (emphasis added). In his brief, the Plaintiff attempts to satisfy his *prima facie* case by using the elements stated in the manner in which the Court has set them out. (Doc. 17 at 11). Accordingly, the Court will also use that articulation of the elements.

[15]  The Defendant actually states that it "denies . . . that the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination." (Doc. 13 at 14). The Defendant's argument on that point centers on the comparator evidence. In light

### 1.    *Adverse Employment Action*

In arguing that the Plaintiff did not experience an adverse employment action,

the Defendant states:

> The plaintiff failed to avail himself of the administrative options
> provided to him by Talladega Housing Authority and resigned in the
> face of the adverse accusations of violating at least four clear policies of
> the Talladega Housing Authority on the night he was stopped for
> speeding. As a result, the plaintiff has not suffered a constructive
> discharge altering the terms and conditions of his employment.
> *Swearnigen-El v. Cook County Sheriff's Department*, 602 F.3d 852, (7th
> Cir. 2010).

(Doc. 13 at 15). The Court does not know what "administrative options" the

Defendant is referring to, as there was <u>no</u> discussion of any in the parties' proffered

facts, and there is <u>no</u> further argument on this point. This underdeveloped, vague

argument is without merit. Further, the Court is confused by the Defendant's

attempted rebuttal of a constructive discharge claim that appears nowhere in the

Plaintiff's Complaint. The Plaintiff claims that the Defendant fired him. As noted in

this Court's discussion of the facts, the evidence, when viewed in the light most

favorable to the Plaintiff, supports this position.

### 2.    *Comparators*

The Eleventh Circuit has noted:

---

of that, and in consideration of the Eleventh Circuit law discussed in the previous footnote, the
Court treats this argument as a "lack of comparator" argument.

As part of the Title VII plaintiff's prima facie case, the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than herself. *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir.1995). To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir.1985), cert. denied, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir.1994). If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. *See, e.g., Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir.1989).

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also*, Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1281 (11th Cir. 2008) ("[T]he most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."); *Calhoun v. McHugh*, 2 F. Supp. 3d 1217, 1236 (N.D. Ala. 2014) (Hopkins, J.) (same).

The Plaintiff argues:

Plaintiff accused Defendant of allowing Steve Watts to have his grandson on the "THA" property in violation of "THA" policy and only told him to get a baby sitter or go home. Mr. Watts was also allowed to use racially derogatory language toward a Black employee, Byron Garrett, and was written up but not terminated.

Tom Lloyd was allowed to have his wife, who was not a "THA" employee to assist him in the "THA" office with his office work and was not reprimanded.

Jay McElroy allowed his son to ride a company lawn mower and in a company truck with Byron Garrett and was not disciplined.

(Doc. 17 at 12). Recall that Nettie Goodwin's letter to the Plaintiff stated he was being terminated for:

1.     Using a company vehicle for [a] personal reason.

2.     Speeding and driving recklessly in a company vehicle.

3.     Bringing and/or storing (including in a desk, locker, automobile, or other repository) alcohol on [THA] premises or property, including [THA]-owned or leased vehicles, or vehicles used for [THA] purposes.

4.     Having possession of, being under the influence of, testing positive for or having in one's system, alcohol.

5.     Using, consuming, transporting, distributing, or attempting to distribute, manufacturing, selling, or dispensing alcohol.

6.     Possession of firearms or other weapons while on THA property, in THA vehicles, or while conducting THA business . . ..

(Doc. 14-17). The Plaintiff's comparators' conduct is not the same or similar conduct to that in which the Plaintiff engaged.[16] Accordingly, the Plaintiff cannot establish a

---

[16]  Further, the Plaintiff does not know of any time that Watts violated the speeding policy or the policy of carrying a firearm or the policy of having alcohol in a company vehicle or in his system on Talladega Housing Authority property.  The Plaintiff has no knowledge of Lloyd ever

*prima facie* case of discrimination. Summary judgment is therefore appropriate.[17]

### C.   **Pretext**

The Plaintiff's case also fails because he cannot prove that the Defendant's legitimate non-discrimination reason for his termination–the violation of workplace rules and policies–was merely a pretext for discrimination.

The Plaintiff's <u>entire</u> argument on this point is: "'THA's stated reasons for termination of the Plaintiff are a pretext for race discrimination because by [sic] the reasons stated in Plaintiff's factual statements 56, 57, 58, 59, 60, 61, 62, 63." (Doc. 17 at 13). The Court doubts whether <u>one sentence</u> referring the Court to another section of the Plaintiff's brief is a sufficient "showing" in this regard. Regardless, it is undisputed that at least two of the reasons Goodwin cited–the possession of the firearm in a company vehicle and use of the vehicle for personal reasons[18]–were

_____

pleading guilty to or being cited for speeding.  He also has no knowledge of Lloyd operating a vehicle at an unreasonable speed.  The Plaintiff knows of no times that Lloyd had alcohol without authorization on the Talladega Housing Authority premises.  The Plaintiff knows of no time that McElroy was cited for speeding or having alcohol in THA vehicles or on THA premises or being in possession of firearms on THA property or in THA vehicles.

[17]  Under any formulation of the elements, it cannot reasonably be said that the Plaintiff's termination occurred "under circumstances which give rise to an inference of unlawful discrimination." *Kilgore*, 646 F. App'x at 773–74.  First, the Plaintiff admitted to using the THA vehicle for a personal reason, and to having the weapon on company property.  Second, Goodwin considered statements from several witnesses which supported her determination that several other violations had occurred.

[18]  Although Goodwin stated in her deposition that the Plaintiff could use the vehicle to run errands while going back and forth to work, there is no evidence that that is what he was

true.[19] Section N of the Employee Handbook provides that employees are subject to "immediate suspension without pay and then dismissal" for "violations of regulations." (Doc. 23 at 11). The Plaintiff makes no argument that he could not have been fired for one, or both, of these admitted offenses.

Also, even if Goodwin was incorrect as to any of the alleged violations, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) *(quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). In the instant case, not only has the Plaintiff not shown that all of the Defendant's reasons were false, he has made no attempt to show that, even if they were, discrimination was the real reason that he was fired. The evidence is all to the contrary. In addition to the admissions by the Plaintiff, Goodwin considered statements from several witnesses which supported her determination that the violations had occurred. There is no evidence that race played any part in her decision to terminate the Plaintiff.

## V.   CONCLUSION

Based on the foregoing, the Defendants Motions to Strike will be **DENIED**,

---

doing when he was stopped.

[19] Although it is also undisputed that the Plaintiff had a permit for the weapon, he was not allowed to have it on THA property, or in a THA vehicle.

the Motion for Summary Judgment will be **GRANTED**, and this case will be

**DISMISSED with prejudice**. A separate final order will be entered.

      **DONE** and **ORDERED** this 19th day of September, 2016.

                                    _____

                                    **VIRGINIA EMERSON HOPKINS**
                                    United States District Judge